1

2

3

4

5

6

7

8            **IN THE UNITED STATES DISTRICT COURT**

9            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   NEHEMIAH ROBINSON,                    No. CIV S-05-1499-LKK-CMK-P

12              Plaintiff,

13        vs.                              FINDINGS AND RECOMMENDATIONS

14   M. PENNER, et al.,

15              Defendants.

16   _____/

17              Plaintiff, a state prisoner proceeding pro se, brings this civil rights action pursuant

18   to 42 U.S.C. § 1983.  Pending before the court is defendants' motion for summary judgment

19   (Doc. 87).  Plaintiff has filed an opposition (Doc. 92).

20

21                          **I.  BACKGROUND**

22        **A.      Plaintiff's Allegations**

23              This action proceeds on plaintiff's first amended complaint, filed on May 26,

24   2006.  In the first amended complaint, plaintiff names the following as defendants:  Penner,

25   King, Swift, Johnson-Dovey, Van Cor, Todd, Turella, Borges, Stocker, and the director of the

26   / / /

1

California Department of Corrections and Rehabilitation ("CDCR").[1]  Plaintiff seeks compensatory and punitive damages.

Plaintiff states that defendant Penner diagnosed him with "severe significant collagen vascular disease," and that another doctor diagnosed him with "post-traumatic degenerative arthritis."  Plaintiff states that he suffers pain in his "major joints, muscles, back, hands, ankles, [and] wrists."  He also states that he experiences joint swelling and weight loss.  Plaintiff says that his condition worsened upon his incarceration in 2000.  He attributes the problem to the cold climate in Northern California.

Plaintiff says that, upon his arrival at prison, he made officials aware of his medical problems.  On December 5, 2000, plaintiff was seen at the prison medical clinic for an orthopedic evaluation.  Plaintiff states that the doctor who examined him recommended knee surgery.  On December 10, 2002, plaintiff was taken to Doctor's Hospital in Manteca, California, for a knee ligament reconstruction operation.

According to plaintiff, on June 9, 2003, he notified prison officials that he was experiencing severe pain and swelling and an inability to walk.  Over the next three days, plaintiff continued to submit requests to go to the clinic.  Plaintiff claims that he did not receive adequate physical therapy after his knee surgery and that, on September 25, 2003, he was again taken to an outside medical facility.  There, a bone scan was performed which revealed a "lateral meniscal tear" in the knee.  Plaintiff states that he filed inmate grievances to the highest level of review concerning his knee problem.  He states that his grievances were partially granted at the first level by defendant Borges; partially granted at the second level by defendants Turella and Lateri; and denied at the third level by defendant Stocker.

/ / /

---

[1]     The court's prior orders incorrectly refer to defendant Van Cor as "Vancor."  Lateri, who was named as a defendant in the first amended complaint, is now deceased and has been dismissed as a defendant.  Service directed to the director of the CDCR was returned unexecuted on March 21, 2007.

1          Plaintiff states that, on January 28, 2005, he filed a "reasonable modification or

2    accommodation request" which was denied by defendant Johnson-Dovey as "not meeting ADA

3    criteria."  After submitting a health care service request form complaining of "severe pain,"

4    plaintiff was examined on February 3, 2005, by defendant Penner, a prison physician.  Plaintiff

5    claims that defendant Penner signed an order that same day documenting plaintiff's medical need

6    to be transferred to a prison in a warmer climate.  Plaintiff alleges that he was informed that he

7    would be notified regarding his transfer within two weeks, but that this was never done.

8          Plaintiff states that, on February 18, 2005, he filed a prison grievance requesting

9    to be transferred.  That request was allegedly reviewed by defendant Johnson-Dovey.

10   Specifically plaintiff states that defendant Johnson-Dovey denied the grievance because no

11   February 3, 2005, order existed at all, and that, on February 23, 2005, defendant Johnson-Dovey

12   requested that plaintiff provide additional information in support of his request.  Specifically,

13   plaintiff alleges that defendant Johnson-Dovey had requested to see a copy of the February 3,

14   2005, order from defendant Penner.  Plaintiff asserts that, on February 25, 2005, he spoke with

15   defendant Penner about the February 3, 2005, order and was told by defendant Penner that the

16   appropriate officials would be provided with the order.  Plaintiff states that he re-submitted his

17   transfer request on February 28, 2005, along with a statement as to defendant Penner's response

18   concerning the February 3, 2005, order.

19         Plaintiff claims that, on March 10, 2005, he submitted a request for the status of

20   his transfer request.  The next day, plaintiff received a response indicating that he would receive

21   a decision soon.  Meanwhile, plaintiff states that he requested health care services again on

22   March 16, 2005, for "severe pain," and that he was seen at the prison medical clinic on March

23   21, 2005.  Plaintiff asserts that he was informed at that time that he was on the list to be seen by a

24   registered nurse.  After waiting over three hours, plaintiff was seen by the nurse, whereupon

25   plaintiff conveyed the foregoing.  The nurse informed plaintiff that he would be informed of the

26   status of his transfer request at a later date.  Plaintiff also states that he was never treated for his

problem that day, but that he was told by the nurse that another medical transfer order would be submitted to defendant Penner.

Plaintiff states that he went to the medical clinic again on March 23, 2005, and was told that he would be seen by a doctor.  Plaintiff also states that, while he was in the medical clinic on March 23, 2005, he went to the nurse's office and asked about the status of his transfer request.  He claims that he was informed that defendant Penner had signed a second medical transfer order on March 21, 2005, and that he would receive a copy of the "medical chrono 128-C" within three weeks.  Plaintiff asserts that another inmate present in the medical clinic on March 23, 2005, overheard a conversation involving  defendant Swift concerning plaintiff's transfer request.  Specifically, plaintiff learned from this that an unnamed prison official instructed defendant Swift to discontinue plaintiff's transfer request.  Plaintiff claims that, after he requested a copy of the discontinuation order, defendant Swift ". . . suddenly became belligerent for no apparent reason" and informed him that he would not be allowed to see the doctor.  Plaintiff states that he told defendant Swift that he would file an inmate grievance based on denial of medical care and conspiracy to deprive him of a transfer to a different prison.  Plaintiff states that, "after learning what [defendant] Swift had done," defendant Penner did in fact sign another order on March 21, 2005.  Additionally, plaintiff claims that he was treated by defendant Todd on March 24, 2005, for "severe pain," but that he refused to prescribe pain medication.

Plaintiff states that, on April 12, 2005, he again reported to the medical clinic and that, while there, defendant Van Cor introduced herself and said that she was present to "observe the issue of the recent physician's order dated 3-21-05, authored by . . . [defendant] Penner . . . and submitted for processing by King. . . ."  Plaintiff claims that he was then informed by prison officials that the March 21, 2005, order had been discontinued by defendant Todd, on her own authority, as unwarranted.  Plaintiff asserts that defendant Van Cor was present.  Plaintiff states that he filed another grievance the same day against defendants Penner, King, Swift, and Van Cor

4

1   "for the acts committed and for not reporting the misconduct," but that defendant Johnson-Dovey

2   refused or neglected to acknowledge or review it.  As to his knee problems, plaintiff states that he

3   made defendant Todd aware of this problem during the April 12th visit.  Specifically, plaintiff

4   pointed out the need for medication.  According to plaintiff, however, defendant Todd "refused

5   to examine [him] and denied him pain medication."

6               Plaintiff was seen at the medical clinic again on April 20, 2005.  Plaintiff states

7   that his vitals were taken and that he was informed that the chief medical officer instructed that

8   plaintiff be given either Tylenol or Motrin IB for his pain.  Plaintiff states that he told prison

9   officials that his medical file reflects that Tylenol is ineffective and Motrin IB causes him severe

10  stomach pain.  Plaintiff claims that officials refused to review his medical file.

11              Plaintiff says that he filed another inmate grievance on May 16, 2005, against

12  defendant Johnson-Dovey for failing to address his prior grievances.  Again, plaintiff alleges that

13  defendant Johnson-Dovey failed to address this grievance.

14              As to the legal nature of his claims, plaintiff alleges:

15              This is an action arising under the Eight and Fourteenth Amendments of
                the Constitution of the United States and Title 42 of the U.S. Code Section
16              1981 and 1983, alleging violations of plaintiff's civil and human rights
                while in the custody of the California Department of Correction and
17              medical staff and correctional officers therein at California State Prison,
                Sacramento . . . .

18

19  Plaintiff claims that defendants Penner, King, Swift, unknown custody official, Johnson-Dovey,

20  Van Cor, and the CDCR director "conspired to deny plaintiff's medical necessity transfer and

21  deliberately indifferently denied plaintiff medical treatment and prescribed medication."  Plaintiff

22  asserts that defendants Johnson-Dovey, unknown custody official, Swift, Todd, and the CDCR

23  director "conspired to deny plaintiff's right to exhaust administrative remedies."  He also claims

24  that defendants Lateri,  Turella, Borges, Stocker, and the CDCR director "denied plaintiff's

25  medical treatment and prescribed medication, which has caused constant pain and deformity of

26  the knee."

1    Plaintiff also states specific allegations as to each individual defendant.  Plaintiff

2    claims that defendant Penner disregarded the misconduct committed by other defendants,

3    knowing that plaintiff suffers from medical problems which cause extreme pain if left untreated.

4    As to defendant Swift, plaintiff alleges that she is liable for discontinuing the February 3, 2005,

5    order and for demonstrating a hostile attitude.  Plaintiff claims that defendant Todd is liable

6    because he "interfered with a medical judgment by non-medical factors, conspired with

7    [defendant] Swift . . . to discontinue the . . . order dated 3-21-05."  Plaintiff asserts that defendant

8    Johnson-Dovey is liable because she "possibly contacted [defendant] Swift and told [her] to

9    discontinue the physician's order dated 2-3-05, knowing plaintiff suffers from a serious medical

10   condition. . . ."  He also asserts that defendant Johnson-Dovey violated his rights by allegedly not

11   acknowledging his grievances, thereby frustrating his ability to exhaust administrative remedies.

12   Plaintiff alleges that defendant Van Cor conspired in the discontinuation of the March 21, 2005,

13   second order.  Plaintiff claims that defendant Lateri, Turella, Borges, and Stocker are liable

14   because they denied plaintiff knee surgery knowing that a serious medical condition existed.

15   Finally, plaintiff states that the CDCR director is liable because he refused to review plaintiff's

16   prison grievances and denied him knee surgery.

17   According to plaintiff, the first amended complaint raises a claim under the First

18   Amendment based on interference with his ability to petition for redress through the prison

19   grievance process, and a claim under the Eighth Amendment based on denial of and/or

20   interference with medical care.  The First Amendment claim is raised for the first time in the

21   amended complaint.[2]   The Eighth Amendment claim was raised in the original complaint.  In

22

23    [2]    As to any First Amendment claim, plaintiff asserts that defendants frustrated his access to redress by refusing to acknowledge his prison grievances, or by improperly denying them.  Plaintiff has not, however, alleged any facts which would suggest any "actual injury,"

24   such as prejudice with respect to contemplated or existing litigation or the inability to meet a filing deadline or present a claim.  See Lewis v. Casey, 518 U.S. 343 (1996).  In fact,

25   notwithstanding defendants' alleged conduct, plaintiff was able to bring this action.  Therefore, at best, plaintiff's First Amendment allegations are another way of alleging that defendants

26   interfered with and/or denied medical treatment.

1    dismissing the claim with leave to amend, the court stated:

2                    As to plaintiff's allegations concerning defendants' alleged
         conspiracy to deny him a medically necessary transfer to another prison,
3        plaintiff has not alleged a serious medical condition necessitating such
         transfer.  Absent a serious condition, no conduct defendants take with
4        respect to the prison transfer can give rise to an Eighth Amendment claim.
         In this case, plaintiff alleges that the prison transfer was necessitated
5        because he is often in "severe pain."  Even if this amounts to a serious
         condition, plaintiff states in his complaint that he was prescribed pain
6        relievers.  To the extent plaintiff's claim is based on his opinion that he
         should have been prescribed some other medication, such a claim is not
7        cognizable under the Eighth Amendment.

8    The court also stated:

9                    Here, plaintiff asserts that the director of the California
         Department of Corrections . . . should be held liable because [he] knew or
10       should have known of the other defendants' violation of his constitutional
         rights, and because it is the policy of the California Department of
11       Corrections to deprive prisoners medical attention.  However, as discussed
         above, the court concludes that plaintiff has failed to state a claim for
12       deprivation of his Eighth Amendment rights.  Therefore, the supervisory
         defendants identified in plaintiff's complaint cannot be held liable.

13

14   In the court's October 5, 2006, order, the court concluded plaintiff had cured these defects in the

15   first amended complaint.  Specifically, plaintiff alleges serious medical conditions – "severe

16   significant collagen vascular disease" and "post-traumatic degenerative arthritis."   He also

17   alleges problems with his knee which ultimately required surgery.  The court concluded the first

18   amended complaint, therefore, raises a cognizable Eighth Amendment claim.

19       **B.**    **Undisputed Facts**

20                   The parties do not dispute that plaintiff suffers from arthritis and associated pain.

21   The record establishes the following additional undisputed facts:

22       1.      Dr. Penner examined and treated plaintiff for knee pain and other
                 symptoms related to arthritis in March 2005 (see Penner's responses to
23               plaintiff's interrogatories, Ex. A to Reager declaration submitted in
                 support of defendants' motion for summary judgment);
24
         2.      In March 2005, plaintiff requested a transfer to a prison in Southern
25               California (see id.);

26   / / /

3.      It was Dr. Penner's "general belief that plaintiff may benefit from being moved to a warmer climate" (see id.);

4.      In Dr. Penner's opinion, "arthritic conditions are unrelated to weather conditions" and "[c]old weather does not 'cause' arthritis nor does warm weather 'cure' arthritis" (see id.);

5.      Dr. Penner believed that, if plaintiff were moved to a prison in a warmer climate, such a move might motivate plaintiff to remain active and exercise, which are the "key[s] to effective arthritis management. . ." (see id.);

6.      Dr. Penner is "well aware that many doctors do not believe that [warmer climates] . . . are 'reasonable or necessary' for the treatment of arthritis" (see id.);

7.      In recommending a transfer, Dr. Penner was erring on the side of "giving the inmate what he wanted in order to improve his morale in the hope that he might be more willing to participate in exercise" (see id.);

8.      Dr. Borges reviewed plaintiff's inmate grievance concerning plaintiff's arthritis pain (see Borges declaration submitted in support of defendants' motion for summary judgment);

9.      At the time of Dr. Borges' review, plaintiff had been referred to a rheumatologist and a bone scan and examination by an orthopedic specialist had been ordered (see id.);

10.     Dr. Borges did not feel that daily examinations, as requested by plaintiff, were necessary in light of the referrals and other evaluations which had been ordered (see id.);

11.     The purpose of Dr. Borges' review was to ensure that plaintiff's complaint had been addressed in some fashion by a treating physician (see id.);

12.     In Dr. Borges' opinion, "osteoarthritis and similar conditions are caused by physiological conditions of the body" and cold weather does not cause arthritis (see id.);

13.     In Dr. Borges' opinion, individuals experiencing arthritis pain will continue to experience pain regardless of the climate (see id.); and

14.     In Dr. Borges' opinion, moving plaintiff to a warmer climate was not medically reasonable or necessary for treatment of his arthritis (see id.).

Further, according to medical records attached to plaintiff's opposition to defendants' motion, and to which defendants do not object, prison officials provided medical treatment for plaintiff's  complaints on the following dates:  August 30, 2000; September 13,

1   2000; December 5, 2000; March 19, 2001; March 22, 2001; January 6, 2003; June 16, 2003;

2   February 3, 2005; March 10, 2005; March 21, 2005; March 24, 2005; April 12, 2005; April 20,

3   2005.  Additionally, plaintiff was treated at Doctors' Hospital of Manteca on December 10, 2002,

4   at which time he underwent diagnostic arthroscopy, and again on September 25, 2003, for

5   radiological studies.

6          Finally, it is undisputed that Dr. Penner's transfer recommendation was voided by

7   prison custody staff.

8

9          **II.  STANDARD FOR MOTION FOR SUMMARY JUDGMENT**

10         Summary judgment is appropriate when it is demonstrated that there exists "no

11   genuine issue as to any material fact and that the moving party is entitled to a judgment as a

12   matter of law."  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

13             . . . always bears the initial responsibility of informing the district court of
              the basis for its motion, and identifying those portions of "the pleadings,
14            depositions, answers to interrogatories, and admissions on file, together
              with the affidavits, if any," which it believes demonstrate the absence of a
15            genuine issue of material fact.

16   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

17   nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

18   judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

19   to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

20   after adequate time for discovery and upon motion, against a party who fails to make a showing

21   sufficient to establish the existence of an element essential to that party's case, and on which that

22   party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning

23   an essential element of the nonmoving party's case necessarily renders all other facts

24   immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

25   whatever is before the district court demonstrates that the standard for entry of summary

26   judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

9

1    If the moving party meets its initial responsibility, the burden then shifts to the

2    opposing party to establish that a genuine issue as to any material fact actually does exist.  See

3    Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

4    establish the existence of this factual dispute, the opposing party may not rely upon the

5    allegations or denials of its pleadings but is required to tender evidence of specific facts in the

6    form of affidavits, and/or admissible discovery material, in support of its contention that the

7    dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

8    must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

9    of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

10   T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and

11   that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict

12   for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

13   In the endeavor to establish the existence of a factual dispute, the opposing party

14   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

15   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

16   versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

17   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

18   genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

19   committee's note on 1963 amendments).

20   In resolving the summary judgment motion, the court examines the pleadings,

21   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

22   any.  See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See

23   Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed

24   before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

25   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

26   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

1   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

2   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

3   show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

4   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

5   'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

6

7                              **III.  DISCUSSION**

8            As outlined above, plaintiff's first amended complaint raises a claim under the

9   Eighth Amendment based on alleged deliberate indifference to his serious medical condition.

10  The treatment a prisoner receives in prison and the conditions under which the prisoner is

11  confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual

12  punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S.

13  825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts of

14  dignity, civilized standards, humanity, and decency."  Estelle v. Gamble, 429 U.S. 97, 102

15  (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v.

16  Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with

17  "food, clothing, shelter, sanitation, medical care, and personal safety."  Toussaint v. McCarthy,

18  801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only

19  when two requirements are met: (1) objectively, the official's act or omission must be so serious

20  such that it results in the denial of the minimal civilized measure of life's necessities; and (2)

21  subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of

22  inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison

23  official must have a "sufficiently culpable mind."  See id.

24  / / /

25  / / /

26  / / /

                                        11

1          Deliberate indifference to a prisoner's serious illness or injury, or risks of serious

2   injury or illness, gives rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at

3   105; see also Farmer, 511 U.S. at 837.  This applies to physical as well as dental and mental

4   health needs.  See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982).  An injury or illness is

5   sufficiently serious if the failure to treat a prisoner's condition could result in further significant

6   injury or the ". . . unnecessary and wanton infliction of pain."  McGuckin v. Smith, 974 F.2d

7   1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).

8   Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition

9   is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily

10  activities; and (3) whether the condition is chronic and accompanied by substantial pain.  See

11  Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

12         The requirement of deliberate indifference is less stringent in medical needs cases

13  than in other Eighth Amendment contexts because the responsibility to provide inmates with

14  medical care does not generally conflict with competing penological concerns.  See McGuckin,

15  974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to

16  decisions concerning medical needs.  See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir.

17  1989).  The complete denial of medical attention may constitute deliberate indifference.  See

18  Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986).  Delay in providing medical

19  treatment, or interference with medical treatment, may also constitute deliberate indifference.

20  See Lopez, 203 F.3d at 1131.  Where delay is alleged, however, the prisoner must also

21  demonstrate that the delay led to further injury.  See McGuckin, 974 F.2d at 1060.

22         Negligence in diagnosing or treating a medical condition does not, however, give

23  rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 106.  Moreover, a

24  difference of opinion between the prisoner and medical providers concerning the appropriate

25  course of treatment does not give rise to an Eighth Amendment claim.  See Jackson v. McIntosh,

26  90 F.3d 330, 332 (9th Cir. 1996).

12

1    In their motion for summary judgment, defendants state:

2    . . . Defendants never refused ro provide care or treatment to
     plaintiff nor were they "deliberately indifferent" to plaintiff's medical
3    needs, if any.  Although Dr. Penner suggested that plaintiff might benefit
     by moving to a prison in a warmer climate, he did so for motivational, not
4    medical reasons.  At most, there is a difference of opinion as to whether
     the move may have been reasonable or necessary.  In any event, none of
5    these defendants had the authority to require the California Department of
     Corrections and Rehabilitation ("CDCR") to move plaintiff.  Custodial
6    staff denied the request for transfer and there was nothing any of these
     defendants could do about it.  Finally, to the extent plaintiff claims to have
7    suffered any pain, suffering or other injury . . . was the natural result of
     plaintiff's conditions paired with his refusal to participate in physical
8    therapy and other treatments and was not caused by any alleged
     wrongdoing on the part of these defendants.  There are no triable issues of
9    fact and defendants are entitled to judgment as a matter of law.

10   Defendants add:

11   In this case, Dr. Penner recommended that plaintiff be transferred
     for motivational, not medical reasons.  Even Dr. Penner readily
12   acknowledges that other physicians may well disagree with his opinions
     and that there is no consensus within the medical community.  Dr. Penner
13   and Dr. Borges both agree and opine that plaintiff's condition is not
     caused by the weather and moving him to another prison would not cure
14   his condition.  They agree that plaintiff would still have arthritis and
     would still experience pain, swelling, and other symptoms no matter where
15   he lives.  Plaintiff's pain, etc., is caused by his condition, not any of the
     acts or omissions of the defendants alleged in the complaint.  Plaintiff has
16   no evidence to the contrary.  (footnote omitted).
     . . . Regardless of whether Dr. Penner's recommendation was
17   medically appropriate, it was disapproved by custody staff.  There is
     nothing else that any of the defendants could have done.  That they could
18   not compel the CDCR to move plaintiff does not equate to "deliberate
     indifference" on their part.  For these reasons, Dr. Penner, Mr. King, Ms.
19   Johnson-Dovey, Ms. Todd, Ms. Van Cor, and Ms. Swift are entitled to
     judgment as a matter of law.
20   The remaining defendants, Dr. Borges, Dr. Turella, and Mr.
     Stocker were not involved in providing any care or treatment to plaintiff.
21   They simply undertook the administrative task of reviewing a 602 appeal
     from plaintiff regarding his arthritis pain.  They interviewed plaintiff,
22   reviewed his medical records, and ensured that his primary care physicians
     were addressing his concerns.  They also confirmed that plaintiff had been
23   referred to appropriate specialists for consultations and had been given
     appropriate treatments in the interim.  They were never asked to provide
24   any care or treatment to plaintiff and they were not "deliberately
     indifferent" to his medical needs.  Dr. Borges, Dr. Turella, and Mr.
25   Stocker are likewise entitled to judgment as a matter of law.

26   ///

13

1    This is essentially the entirety of defendants' argument, the gravamen of which is that the facts

2    show a difference of medical opinion concerning the necessity of a transfer for plaintiff's arthritis

3    pain, and not deliberate indifference to a serious medical condition.

4             Based on a careful review of the evidence of record, it is clear that there is no

5    dispute that plaintiff suffers a serious medical condition, namely arthritis and associated pain.  It

6    is also undisputed that plaintiff has received extensive treatment while in prison and has been

7    seen on a number of occasions by prison medical staff for this condition.  Further, it is

8    undisputed that Dr. Penner recommended that plaintiff be transferred to a prison in a warmer

9    climate.  Finally, it is undisputed that this transfer recommendation was denied by prison custody

10   officials.

11            At best for plaintiff, the only issue in dispute is whether a prison transfer was

12   medically necessary.  According to plaintiff it was; according to defendants it was not.  The most

13   such a dispute establishes, however, is that there is a difference of opinion.  As outlined above, a

14   difference of medical opinion cannot form the basis of liability under § 1983.  Thus, this dispute

15   is not material to the issue of deliberate indifference.

16            With respect to plaintiff's allegations of a  "conspiracy" by certain defendants to

17   void the recommended transfer, it follows that if the transfer is not medically necessary, the

18   alleged "conspiracy" also cannot establish liability under § 1983.  In other words, it does not

19   matter, in the context of an Eighth Amendment claim based on deliberate indifference to medical

20   needs, why plaintiff was denied the transfer because the need for a transfer was a matter of

21   medical opinion, not medical necessity.

22

23                                    **IV.  CONCLUSION**

24            Based on the foregoing, the undersigned recommends that:

25            1.       Defendants' motion for summary judgment (Doc. 87) be granted; and

26            2.       The Clerk of the Court be directed to enter judgment in favor of

                                                14

defendants and against plaintiff and to close this file.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


DATED: January 16, 2008

CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE

15